**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| **Plaintiff,** ) | |
| **vs.** ) | **CASE NO:06-20185** |
| ) | **HON. VICTORIA A. ROBERTS** |
| **D-1 ROY WEST** ) | |
| **Defendant.** ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS WIRETAP EVIDENCE, OR, ALTERNATIVELY FOR AN EVIDENTIARY HEARING

### I. BACKGROUND

On October 7, 2005, Samuel A. Yannucci, Assistant United States Attorney for the Northern District of Ohio filed an application for an order authorizing the interception of phone calls to and from cellular phones bearing the number (330) 573-4870. The specific targets of the wiretap were defendants Roy West , Michael Bracey, and other persons named in the application but deleted in the copy of the application provided to the defense. The application was supported by an affidavit from Kevin T. Borchert, a Special Agent of the DEA in Cleveland, (hereinafter referred to as the " Borchert Affidavit )."  On October 7, 2005, an order authorizing the requested interception was approved by the Honorable John R. Adams in the  Northern District of Ohio. Interceptions pursuant to this authorization began on October 9, 2005. By October 10 , 2005, agents determined that the phone was not in the possession of the person authorities believed possessed it.

On October 27,2005, AUSA Yannucci applied for authorization to intercept calls to and from cellular phone ( 330) 752-5529. The application set forth that the phone was

1

possessed and used by defendant Roy West (Oct. 27 App., pg 1). The application was supported by an affidavit from Daniel D. Wehrmeyer , a Special Agent of the DEA in Cleveland ( hereinafter referred to as the " Wehrmeyer Affidavit "). The Wehrmeyer Affidavit, in addition to setting forth additional matters, incorporated the Borchert Affidavit of October 7, 2005. The specific targets of the application were defendants Roy West, Michael Bracey, Alseddrick West, and other deleted parties( Oct. 27 App., pg.2). On October 27, 2005, an order authorizing the requested interception was signed by Judge Adams. Interceptions pursuant to this authorization began on October 27, 2005, and ended on November 25, 2005.

On November 29, 2005,  AUSA Yannucci applied for an extension of the October 27, 2005 order authorizing the intercepts on (330) 752-5529. The order was granted by Judge Adams on the same date. On December 29, 2005 and January 27, 2006, additional extensions were obtained from Judge Adams by AUSA Yannucci. The three applications for extensions were each supported by an affidavit from DEA Special agent Wehrmeyer.[1]

---

[1]) In addition to the wiretaps referenced above, conversations in which defendant Roy West was a participant were  also intercepted pursuant to other  Title III authorizations. Those authorizations are as follows: 1. September 28, 2005, application by AUSA Elizabeth A. Stafford, order signed by Honorable Bernard Friedman, Eastern District of Michigan, on phone number (313) 304-7959 allegedly used by Michael Bracey; 2. October 31, 2005,  application by AUSA Elizabeth A. Stafford, order signed by the Honorable Bernard Friedman, Eastern District of Michigan, on phone number (313) 304-7959, allegedly used by Michael Bracey and ;  3. November 4, 2005, application by AUSA Elizabeth A. Stafford, Order signed by the Honorable Bernard Friedman, Eastern District of Michigan, on phone number (313) 304-7959, allegedly used by Alvino Cornelius and Michael Bracey. Counsels for West believe the conversations overheard as a result of these wiretaps will be the focus a Motion to Suppress to be filed by codefendants. Defendant Roy West, being an "aggrieved person" in those overhears, will move to join in that motion.

2

## II. <u>BASIS FOR SUPPRESSION</u>

### A. THE OCTOBER 7, 2005  BORCHERT AFFIDAVIT AND THE OCTOBER 27,2005  WEHRMEYER AFFIDAVIT FAIL TO ESTABLISH THE REQUISITE NECESSITY TO INTERCEPT CONVERSATIONS ON CELL PHONE NUMBER (330) 752-5529

Title 18 Section 2518 (1)(c) states:

> Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
>
> > ( c ) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to dangerous;

a. <u>Law applicable to necessity requirement</u>

The necessity  requirement "exists in order to limit the use of wiretaps, which are highly intrusive." <u>United States v. Blackmon</u>, 273 F.3d 1204, 1207 ( 9th  Cir. 2001). The Sixth Circuit has clearly recognized this fact and has stated that the purpose of the necessity requirement is  " to ensure that a wiretap is not resorted to in situations where traditional investigative techniques   would suffice to expose the crime. " <u>United States v. Alfano</u>, 838 F.2d 158, 163 ( 6th Cir. 1988) quoting <u>United States v. Kahn</u>, 415 U.S. 143, 153 n. 12, 94 S. Ct. 977, 39 L. Ed 2d 225 ( 1974). Also, <u>United States v. Rice</u>, 478 F.3d 704, 710 ( 6th Cir. 2007).

Due to the highly intrusive nature of wiretaps, and due to  the desire to limit that intrusion to only those  situations in which normal investigative techniques are not sufficient,  the cases hold that the procedural steps provided for in 2518 must be strictly

3

adhered to. See Blackmon at 1207 citing United States v. Kalustian, 529 F. 2d 585, 588 ( 9th Cir. 1976) Also,   United States v. Giordano, 416 U.S. 505, 40. L. Ed 2d 341, 94 S.Ct. 1820 ( 1974). It is only through strict adherence that any force can be given to the statement by the Supreme Court in Dalia v. United States,  441 U.S. 238, 250, 99 S.Ct. 1682, 60 L.Ed. 2d 177( 1979) that " [T]he plain effect of the detailed restrictions of Section  2518 is to guarantee that wiretapping or bugging occurs only when there is a genuine need for it and only to the extent that is needed".

It is incumbent on the government to overcome the statutory presumption against granting a wiretap application by a showing of necessity. Giordarno , 416 U.S. 505, 515. United States v. Ippolito, 774 F. 2d 1482,1486 ( 9th Cir. 1985), Whitney v. United States, 445 U.S. 934 (1980). The remedy for a  failure to demonstrate necessity is suppression of the evidence. 18 U.S.C. 2515 (10).

The question of what is required by way of an investigation by the government in order to demonstrate that normal investigative means have been tried and failed or are unlikely to succeed has been addressed in the Ippolito  case. The court in Ippolito stated:

> Although  the government need not pursue every alternative means of investigation, neither should it be able to ignore avenues of investigation that appear both fruitful and cost-effective. It is not unreasonable to expect the government to utilize those methods that appear to be potentially productive. We would flout the statutory intent that wiretaps be used only if necessary, were we to sanction a wiretap simply because the government pursued some " normal" investigative strategies that were unproductive, when more fruitful investigative methods were available. In effect, the government would be able to secure a wiretap in every case, even where a normal strategy would be likely to achieve the same result without resort to the serious intrusion that a wiretap necessarily entails.

774 F.2d at 1486.

4

In an effort to meet the requirements of 2518 (c), the Wehrmeyer Affidavit attempts to demonstrate how normal investigative techniques used in the investigation failed or were likely to fail in the following areas: confidential sources, undercover agents, physical surveillance, grand jury investigations, immunity and interviews, telephone toll analysis, and search warrants. The affiant concludes that the only technique with a reasonable likelihood of obtaining sufficient evidence against Roy West and any possible associates is a Title III wiretap. However, a careful review of the assertions put forth by the affiant concerning each of the normal techniques set forth in the affidavit reveals that many of the claims in the affidavit are non-specfic, boilerplate, generic representations found in all wiretap applications and that where specific information is provided, the information demonstrated, contrary to many of the affiant's statements in the affidavit, that normal investigative techniques were either not failing or were clearly potentially productive thus obviating the necessity of a wiretap.

        b. <u>Affidavits in this case</u>

                1. <u>Investigation conducted through use of confidential sources</u>

The October 7, 2005, Borchet affidavit sets forth information obtained from twelve confidential informants and the basis for concluding that the information provided by those informants was reliable. The following is some of the information alleged to have been provided by the sources in the Borchet Affidavit:

        a. CS-1:

                1. West was supplying large quantities of cocaine to several

individuals in Akron and that since 1994 CS-1 has personally obtained approximately six and one-half kilograms from West ( Par. 29);

2. CS-1 provided the name of a least one other person that he had pooled his funds with in order to purchase cocaine from West. The person's name is redacted from the affidavit (Par. 29);

3. West's source is a connection he made though his paramour, Sonya Mendoza-Greigo; ( Par. 29);

b. CS-2:

1. Between the summer of 2002 and the summer of 2003 he sold twenty to thirty kilograms of cocaine that had been fronted to him by West in five kilogram quantities ( Par. 31);

2. Provided the names of several persons who West supplied cocaine to . All of the names are redacted from the affidavit ( Par. 31);

3. West's source is a connection made through his paramour (Par. 31);

c. CS-3:

1. Named a person as a multi-kilogram cocaine distributor in Akron and advised agents that for six to seven months in 2003, CS-3 cooked kilogram quantities of crack cocaine for this person on a weekly basis. The person's name is redacted from the affidavit ( Par. 32);

d. CS-4:

1. In April 2004 he observed West and others at a car wash counting large sums of money that was contained in three duffle bags. The names of

the persons present are redacted from the affidavit.[2]  West told CS-4 that the majority of his money came from the sale of cocaine( Par. 35);

2. On April 4, 2005 CS-4 advised agents that on that day while he was at a certain house a person had informed him that he had cocaine to sell. He was shown two kilos of cocaine. The residence he was at and the name of the person offering the cocaine are redacted from the affidavit. ( Par. 66-67)

Agents obtained a search warrant for the address. During the search they recovered steel barrels contained inside a crate. One of the barrels contained an unwrapped bail of marijuana. A further investigation based on the recovered crates led to the recovery of 1117 pounds of marijuana. ( Par. 68-70)

e. CS-5:

1. In the winter of 2003 he observed six kilos of cocaine in West's apartment. A few months later West fronted him a kilo of cocaine ( Par. 36);

2. He observed a person bring a grocery bag filled with money and give it to West (par. 36)

3. West always bragged about his cocaine connection with Mexicans who he met through his paramour, Sonya Mendoza-Greigo ( Par. 36);

4. Between January, 2004 and October 2004 he obtained three to five kilos of cocaine from West ( Par. 36 );

5. On March 15, 2005 he went to " the spot" to meet West. At that location he saw Roy and Alseddrick West along with another person. Alseddrick was

---

[2]) The affidavit does say one of the participants was supposedly West's lawyer.

delivering money to Roy West. CS-5 observed an estimated $80,000 to $120,000 sitting on a table ( Par. 58);

f. CS-6:

1. On February 14, 2005, CS-6 had  a monitored conversation with someone in which the parties spoke of conducting a drug transaction. The following day more drug  conversations between the parties were recorded, survellinace was conducted, and CS-6 obtained a half kilogram from the person ( Par. 41-47 ).  The name of the seller is redacted from the affidavit;

2. On February 24, 2005, CS-6 engaged in recorded drug conversations in an attempt to purchase heroin from someone. Surveillance was conducted. No purchase took place. The name of the person CS-6 recorded and was to buy from is redacted from the affidavit ( Par. 50-56);

3. On March 24, 2005, CS-6 attempted a second purchase from the same person he attempted to purchase from on February 24, 2005. The attempt was unsuccessful ( Par. 59-65)

4. On July 28, 2005, CS-6 conducted what the affiant believed to be a recorded drug conversation with a person whose name is redacted from the affidavit ( Par. 88).

g. CS-7:

1. On February 24, 2005, CS-7 tells agents that earlier that same day he saw Roy and Alseddrick West in possession of numerous doses of heroin valued at $30,000 at his sister's residence. Police executed a search warrant at the residence and recovered a small amount of marijuana and money, three guns,

ammunition, and a digital scale. No heroin was recovered .

CS-7 also identified someone as a member of the Roy West cocaine distribution organization. The name of that person is redacted from the affidavit (pars. 48-49);

h. CS-8

1. On March 1, 2005, CS-8 was interviewed about Roy West. He told agents that earlier that same day he met with someone at a certain place in Akron and saw that person in possession of approximately nine ounces of cocaine. CS-8 placed a recorded call to the person and arranged to buy cocaine the next day. The name of the person is redacted from the affadvit.

Agents got a search warrant to search the address where CS-8 observed the cocaine. They recovered 202 grams of coke, a small amount of marijuana, a gun and a hydraulic cocaine press. Additionally two people were arrested at the address. Both persons gave statements saying who they rented rooms from, who the cocaine belonged to, and that West along with someone conducted business in the basement at the address.

The name of the person CS-8 spoke to and set up the buy, the names of the persons who were arrested and gave information about West conducting " business", and the name of the person from whom the arrested persons rented their rooms are redacted from the affidavit ( Par. 55-56 )

i. CS-9:

1. He works with a cocaine distributor in Akron. The name of the distributor is redacted. He knows that the distributor he works with gets his drugs from

someone. The name of that person is redacted. When that person is out of drugs he

gets it from someone. The name of that person is redacted. CS-8 then informed agents

that one of the redacted people  sometimes obtains cocaine from West (Par 57 );

       j.  CS-10:

          1. On May 18, 2005 , CS-10 advised agents that he has purchased

four and one-half to nine ounces of cocaine from West in Akron on approximately

twenty to thirty occasions. He described where the sales always occurred. He further

provided the names of others associated with the alleged West drug operation. One of

the other persons was Alseddrick West. The names of the others are redacted from the

affidavit; ( Pars. 71-72)

       k. CS-11:

          1. On May 19, 2005, CS-11 provided agents with the name and

address of an Akron dealer who sells one-eight to one-half kilograms of cocaine in

Akron. The name of the dealer is redacted from the affidavit (par73);

          2. On June 2, 2005, CS-11 placed a recorded call to a person. A

drug related conversation ensued on that date and again on June 14 but the sale never

took place. The name of the seller is redacted from the affidavit ( Par78-80 );

          3. CS-11 provided agents with the type of vehicle driven by West

and the license plate number ( Par. 81);

          4. On July 26, 2005, CS-11 conducted a controlled purchase with

someone for 27 grams of cocaine. The name of the seller is redacted from the affidavit (

Par 80-86 );

I. CS-12:

1. Informed agents that in the last week of April 2005 Michael Bracey and Alvenio Cornelius traveled to Akron and obtained twenty to twenty-five kilos of cocaine from West and brought them back to Detroit ( Par. 75);

2. A month later Cornelius and another person returned to Akron to obtain another twenty to twenty-five kilos but they were advised by West that the police had seized the shipment ( Par. 76)

3. CS-12 observed Cornelius meet with Greg in Akron at a residence. He also observed two kilos of cocaine, several hundred ecstacy pills , and a large amount of money at the residence. CS-12 told agents Cornelius was in possession of approximately one hundred grams of heroin which he delivered to Youngstown ( Par. 76);

In addition to the October 7, 2005 Borchet Affidavit, the Wehrmeyer Affidavit details additional  activities of CS-12 and relates information obtained from  two other sources, CS-13 and CS-14.

a. CS-12:

1. Informed agents that on October 1-2, 2005, Cornelius was going to travel from Detroit to Cleveland to meet West. On October 1, 2005, CS-12 told agents Cornelius and West had met at Moon's house in Cleveland where West gave Cornelius ten kilos of cocaine which Cornelius brought back to Detroit; ( Wehrmeyer Aff. 26 )

2. Informed agents that on October 15-16, 2005, West and Cornelius traveled to New York to obtain a large shipment of cocaine. The cocaine was

delivered to Akron. Cornelius brought 30 kilos back to Detroit. CS-12 saw 5 of these kilos; ( Wehrmeyer Aff. Par. 27 )

   b. CS-13:

    1. On September 14, 2005,  CS-13 recorded drug conversations with a person concerning  the attempted purchase of cocaine by CS-13. Although CS-13 met with the person, no sale took place. The name of the seller is redacted from the affidavit( Wehrmeyer, Par. 17-18);

   c. CS-14

    1. On September 23, 2005,  CS-14 conducted a control purchase from a person. CS-14 was fronted half of the cocaine  ( 4 ½  ounces ). On September 26, 2005, CS-14 was recorded by agents paying the person for the fronted cocaine. The name of the seller involved in these transactions is redacted from the affidavit        ( Par.20-21).

    2. On September 26, 2005, CS-14 was interviewed regarding his knowledge of West. CS-14 described a relationship he had with a person that CS-14 obtained a minimum of 15 kilos of cocaine from in the last five years. CS-14 went on to inform agents that the person developed a relationship with West and that originally West would come to Canton, Ohio and deliver multiple kilograms of cocaine to the person but that West stopped coming to Canton and now the person has to travel to Akron to obtain cocaine from West. The name of the person CS-14 had the relationship with who obtained drugs from West is redacted from the affidavit ( Wehrmeyer  Aff. Pars. 21-23).

The Borchet and Wehrmeyer Affidavits establish that agents had developed a substantial network of confidential sources who had penetrated the alleged West organization and were providing productive information that was furthering the goals of the investigation. Several of the sources informed agents they had actually obtained large amounts of cocaine from West. Those sources included CS-1 ( six and one-half kilograms since 1994),   CS-2 ( twenty to thirty kilograms between the summer of 2003 and the summer of 2004), CS-5 ( three to five kilos between January, 2004 and October 2004), and CS-10  ( four and one-half to nine ounces on approximately twenty to thirty occasions).

Several of the sources provided the names and details of other dealers who had purchased drugs from West, had specific information concerning West, or were involved in the alleged West organization. Those sources included CS-1( named person he pooled money with to allegedly buy from West), CS-2 ( several persons who West allegedly supplied cocaine to), CS-7( names a member of West's alleged organization), CS-8 ( persons arrested at address with cocaine giving statement that West conducted business at the address), CS-9 ( named person obtaining cocaine from West), CS-10 ( names of others in the alleged West organization), CS-12         ( provided information on Michael Bracey and Alvenio Cornelius concerning their travels from Detroit to Akron to obtain multi-kilo amounts of cocaine , and CS-14 ( naming a person who allegedly purchased kilos of cocaine from West).[3]

Several sources related information concerning seeing West with large amounts

---

[3]) Many of the names given by the sources are redacted from the affidavits but, obviously, were known to the agents.

of money and drugs. (CS-4, CS-5 , CS-7, and CS-12). Other sources  gave information

relating to where West allegedly got his cocaine connection from ( CS-1, CS-2, and CS-

5).

The agents were also successful in having CS-6, CS-11, and CS-14 engage in

controlled buys. Also, CS-13 engaged in a recorded drug conversations with another

person. Agents also received information from CS-4, CS-7, and CS-8 that led to the

obtaining and execution of search warrants.


2. <u>Need for Wiretap</u>

Agent Wehrmeyer, in the face of all of the information and evidence obtained

through the use of confidential sources, sets forth in paragraphs 49-56 reasons he

believed rendered  the use of confidential informants an insufficient investigative

technique. His reasons both  misrepresented and ignored the reality of the investigation

prior to obtaining the wiretap.

Most of the information contained in paragraph 49 is exactly the type of

boilerplate information that is insufficient to meet the specificity requirement of 2518 (c).

The reason for the specificity requirement is to prevent the government from making

general allegations about classes of cases and thereby rendering the necessity

requirement meaningless. See <u>United States v. Landmesser</u>, 553 F.2d 17, 20 ( 6th Cir)

and <u>United States v. Robinson</u>, 698 F.2d 448 ,453 (D.C. Cir. 1983) where the court

stated:

> " we must be careful not to permit the government merely to characterize
> a case as a 'drug conspiracy' ... that is inherently difficult to investigate.
> The affidavit must show with specificity why in this particular investigation

ordinary means of investigation will fail."

Paragraph 49 posits conclusory statements that apply in all drug cases as opposed to containing specific factual circumstances. It refers to not being able to fully identify all the members of the organization or the workings of the organization. It refers to informants only having limited information. Paragraph 49 concludes with the affiant stating that " to the extent the sources have provided specific, first hand information, it is limited in scope and more 'historical' than current." This statement is made despite the fact that CS-12 was giving specific information about Cornelius going from Detroit to Cleveland on October 1-2, 2005 in order to obtain ten kilos of cocaine from West and about West and Cornelius traveling on October 15-16, 2005 ( some twelve days before the Wehrmeyer Affidavit was submitted) to New York and obtaining a large shipment of cocaine that was subsequently delivered to Akron. CS-12 also provided specific information that once the cocaine got to Akron, Cornelius took thirty kilos back to Detroit and that he had seen five of the thirty kilos.

In addition to the information provided by CS-12, CS-4 had provided specific information in April, 2005 , that led to the obtaining of a search warrant. CS-5 had provided information in March of 2005 that he had observed West with $80,000 to $120,000 in cash. CS-6 , CS-11, and CS-14 were doing controlled buys in February, July, and September of 2005. CS-7 and CS-8 gave agents information in 2005 that led to the obtaining of search warrants. CS-13 was recording drug conversations for the agents in September 2005. In short, the statement that " to the extent the sources have provided specific, first hand information, it is limited in scope and more 'historical' than current " is untrue. It was set forth in the affidavit in an attempt to justify the failure of the

affiant to pursue an obviously already successful avenue of investigation.

Paragraph 50 of the Wehrmeyer Affidavit contains the assertion that CS-1,2,3,4,7,8,9, and 10 have all provided information but each of them is incarcerated and unable to give up-to-date information. However, as is detailed above, it appears in the affidavit that CS-4, CS-7,CS-8, CS-9 , and CS-10 were providing extensive information from late February through May of 2005 . That information led to the obtaining of warrants and the eventual seizure of a large amount of marijuana ( Pars. 66-70), guns, ammunition  ( Pars 48-49 ), cocaine , a hydraulic press,  recorded drug conversations ( Pars. 55-56),  and the names of multiple persons who obtained cocaine from West.

The Wehrmeyer  Affidavit does not indicate in any way when any of the informants went into custody, what they went into custody for, or for how long they were to remain in custody. It is therefore impossible to tell whether the disruption in information from the informants was of a temporary or permanent nature. The reader of the affidavit is left to assume that CSs 4,7,8,9,10 were all arrested in the eight  months preceding the Borchet affidavit and were all incarcerated for the foreseeable future. Of course, it is also impossible, without a hearing, for the defense to challenge this suspect assertion in that the names of the sources are known only to the government.

In paragraph 51 of the Wehrmeyer Affidavit the agent attempts to dismiss the long-time established relationship that CS-5 had with West that led CS-5 to provide agents with details of his obtaining kilos of cocaine from West. He also provided information concerning alleged observations of cocaine in West's apartment and  large sums of cash being possessed by West in March of 2005. CS-5 further provided the name of the person from whom West bragged he obtained his cocaine connection.  The

agent dismisses this obviously fruitful source by making the blanket conclusory assertion that CS-5 currently  cannot or will not obtain cocaine from West. This assertion is made even though in the Borchet Affidavit the agent asserts that CS-5 is still providing information to Akron Police Department Narcotics Unit in return for prosecutorial consideration for the information he provides. ( Borchet Aff. Par 21).

In the same paragraph ( 51) the affiant tries to dismiss the recent ( October, 2005 ), specific information provided by CS-12 by asserting that " CS-12's assistance has been useful in obtaining information with respect to West, however the majority of the information provided by CS-12 is limited to accomplices and activities in Detroit, Michigan. The information CS-12 has provided with respect to West's activities in Akron, Ohio, is outdated and limited to descriptions and observations rather than specific details."  It is hard to understand how Wehrmeyer can make such a statement when they are refuted in his own affidavit in paragraphs 26 and 27.

Paragraphs 26 and 27 reveal that CS-12 provided information as to Cornelius meeting with West on **October 1 and 2, 2005** in Cleveland. It set forth the specific information of whose house they met at and how much cocaine **West** allegedly gave Cornelius. The information then went on to specifically state what Cornelius did with the cocaine.

If October 2, 2005 was not recent enough information about West, CS-12 also informed agents that on **October 15-16, 2005, West** and Cornelius went to New York and brought cocaine back to **Akron**. CS-12 gave the specific information that 30 kilos were then brought from Akron to Detroit and that he saw 5 of the kilos and that each of the 5 kilos had a crown imprint.

17

When one looks at the information concerning CS-12 in Wehrmeyer's paragraphs 26-27 and adds that to the information that CS-12 had previously provided as set forth in the Borchet Affidavit ( paragraphs 75-76)[4] it is clear, contrary to the agent's assertions in Paragraph 51, that the agents had obtained an informant who was an insider in the alleged West organization. He had up to the minute specific information concerning West and persons the agents believed to be working with West and, as set forth in the Borchet affidavit he was still actively cooperating with the FBI in return for monetary compensation. ( Borchet Aff. Par.28)

In the face of CS-6's recorded conversations with a West associate and his controlled purchase from that associate in February 2005, and in the face of the agents assertion that these conversations and sale reveal the West associate to be currently involved in drug trafficking, the agent seeks to dismiss the utility of this source by saying he doesn't believe CS-6 could develop suitable rapport with his source to obtain more comprehensive details of his drug dealing ( Par. 52). No reason is given why an attempt could not even be made to develop this rapport.

Next the affiant attempts to dismiss the efforts of the actively cooperating ( for monetary compensation) CS-11 who had successfully recorded drug conversations in June 2005 with one person   and conducted a drug transaction with a second person in

---

[4]) Paragraphs 75-76 detail specific information as to when co-defendants Bracey and Cornelius traveled to Akron ( Last week of April 2005), approximately how much cocaine they allegedly received from West, what they did with the cocaine, and when Cornelius went back to Akron ( late May 2005)  to obtain more cocaine from West. These paragraphs also set forth that during that trip to Akron, CS-12 observed two kilos of cocaine. CS-12 also informed the agents about how much heroin Cornelius allegedly possessed and where he distributed it.

July 2005. Both of these persons were presumably West associates. Wehrmeyer states that the first person showed an unwillingness to sell to CS-11 and that even if CS-11 could purchase from this redacted person the affiant opined that it wasn't likely he could buy from other West associates ( Par. 53). Apparently no further attempts were made to discover if, in fact, either of these propositions were true.

In paragraph 55 the affiant states that the AUSA who filed the application for the Title III in this case has advised him that at least three of the persons who were recorded engaging in controlled buys/drug conversations from CS-6, CS-13, and CS-14 could be prosecuted as a result of the sales.[5] However, it goes on to opine that the prosecution of these persons would not dismantle or significantly disrupt the West organization. Apparently, no attempt was made to confront these three persons in order to ascertain if they, like so many others, were willing to cooperate with authorities in order to avoid or ameliorate their own prosecution.

The Wehrmeyer Affidavit establishes that the use of confidential sources had enabled agents to engage in controlled purchases from persons allegedly involved in the West organization. These informants had provided specific details of drug dealing that led to the obtaining of search warrants whose execution proved to be fruitful. The sources provided first hand information about obtaining drugs directly from West. They provided

---

[5]) Counsel for West can not determine whether three or four names are listed as persons who could be prosecuted because all of the names are redacted from the affidavit by a black marker making it difficult to tell if three or four names are being deleted.

the names of numerous other persons who were allegedly involved in drug transactions with West. The information was so current that it pinpointed the activities of West and Cornelius days before the affidavit was submitted to the issuing judge. Despite the successful use of these confidential sources, the affidavit is inexplicably devoid of any attempts by the agents to have these sources engage in consensual conversations with West, to attempt to do controlled buys from West, to attempt to introduce undercover agents to West, or to approach those persons who faced prosecution due to the success of the investigation in an attempt to have them cooperate against West and his organization. These potentially productive normal methods of investigation were obvious to the agents. They had successfully used them in the investigation.

What was done in the Roy West investigation illustrates the exact concern expressed by the court in Ippolito ---that to seek a wiretap when a normal strategy would likely be successful would lead to the ability of the government to secure a wiretap in every case, thus defeating the limited use of highly intrusive wiretaps as envisioned in the Title III statutes.

### 3. Undercover activity/Undercover agents

The Wehrmeyer Affidavit in paragraphs 57 and 58 dismisses the use of undercover agents ( UCA ) to infiltrate the West organization on the basis of conclusory statements that drug dealers are suspicious of new players, especially in Akron, and that UCAs usually have limited contact with members of the organization. The affidavit then gives opinions about the hierarchy of a drug organization and the desire of drug dealers to protect the identity of its suppliers and associates. These statements can be said about

any drug investigation, in Akron or any other city, and in this specific case the agent's assertions, set forth above concerning the fourteen confidential sources, belie his assertions in this section of the affidavit. A simple reading of the information listed above demonstrates that the agents had obtained a plethora of information and persons who allegedly had direct dealings with West and others in his organization. Despite all of these resources, the affidavit is devoid of one instance where the agents attempted to either do a consensual recording or to engage in any undercover activity with West. Once again, these were obvious normal techniques that should not have been ignored by agents in the course of the investigation.

    4. <u>Physical surveillance</u>

In addition to setting forth what the affiant believed to be the limitations of physical surveillance in all drug investigations the affidavit states that :

> " Your Affiant knows that surveillance efforts directed at West and other subjects of this investigation over the past several years has not resulted in any meaningful evidence of criminal activity. Over the past year your Affiant has conducted frequent " drive by " surveillance and coordinated "loose" physical surveillance of several residences and members involved in this conspiracy. ( Par.61)

The affidavit also states that:

> " Furthermore, due to their " business savvy" with respect to narcotics trafficking, and frequent counter-surveillance actions exhibited by West, REDACTED, and other members of this organization, investigators have been unable to use " tight " surveillance. ( Par. 61)

The affidavit continues to say that:

> "West has also exhibited these same techniques ( evasive driving techniques) during surveillance details conducted by investigators." ( Par. 61)

In light of the assertions by the agents that surveillance had been conducted on West for  "several years, " counsel for West requested from the government any records or reports that existed relative to the surveillance.  On February 16, 2007, in response to the request, AUSA Stafford stated in a letter to counsel that " The Government is unaware of the existence of any surveillance or surveillance records pertaining to Roy West."

The Sixth Circuit in the recent case of United States v. Rice, supra, was presented with an appeal by the government of a district court order suppressing  evidence obtained from a Title III wiretap. In that case the affidavit stated that  " physical surveillance of the subjects of this investigation has been conducted and is presently being conducted with only limited success. Physical surveillance has identified locations and vehicles utilized by members of this organization. Physical surveillance has also corroborated information provided by the CS. " The affidavit also stated that members of the organization had violent histories and routinely carried guns thus presenting a danger to law enforcement personnel attempting to conduct physical surveillance.

The district court in Rice conducted a suppression hearing. At that hearing the affiant testified that agents had not conducted any physical surveillance on Rice and that they had no specific information on whether Rice carried a gun. The district court found that , based on the affidavit, an issuing judge would mistakenly think  that agents had conducted physical surveillance on Rice and/or his associates and that the affiant had information leading him to believe that Rice and/or his associates had used violence or threats of violence and carried guns.

The Sixth Circuit, in affirming the district court decision suppressing the Title III evidence, cited the rules set forth in the cases of <u>Alfano, Kahn</u>, <u>Giordano</u>, and <u>Landmesser,</u> supra.

A reading of the affidavit in this case would lead the issuing judge to believe that extensive surveillance had been conducted on West and that the surveillance had not been fruitful. It also would have led to the conclusion that West was aware that he was under surveillance and that he was undertaking actions to frustrate that surveillance. These conclusions could well have played a role in the authorizing judge's decision that the agent had established that  ordinary techniques had been used and failed thus necessitating the need for a wiretap.

5. <u>Grand Jury Investigation/Immunity and Interviews</u>

The affidavit dismisses the use of a Grand Jury or the granting of immunity  to certain individuals on the basis of conclusory statements and opinions of the affiant. It asserts that individuals called before the Grand Jury would be likely to lie under oath unless they were confronted with facts which would force them to tell the truth and that such facts are not available to the government. ( Par. 65 c ). At the same time the affidavit lists the redacted names of several people in the West organization who were successfully recorded by agents engaging in controlled buys. It goes on to refer to an already existing wiretap that had led to an associate being " caught in the act" of distributing cocaine ( Par. 69) It is hard to imagine stronger evidence with which to confront witnesses then their voices on a recording engaging in drug transactions or with evidence of them being caught in the act of distributing cocaine. At a minimum, whether in

a Grand Jury setting or in another setting, an attempt should have been made to confront these witnesses with these available facts instead of asserting in the affidavit that such facts did not exist.

The Wehrmeyer affidavit establishes that in addition to confidential sources other normal investigative methods were being successfully employed and were likely to continue to succeed. The affidavit sets forth a conversation that occurred on October 8, 2005, between West and co-defendant Bracey that was intercepted from a Title III wire on a phone utilized by Bracey. The agent asserts that the conversation concerns the delivery of drugs from West to Bracey through a courier. It posits that the Bracey wiretap confirmed a narcotics relationship between West and Bracey ( Pars. 32-33 ) and that continued interceptions over Bracey's cellular phone might reveal further particulars about their dealings.[6]

The affidavit states that agents have proposed a Title III intercept on a phone used by co-defendant Alvino Cornelius. [7] ( Par. 45) It further asserts that another wiretap over REDACTED telephone has confirmed a multi-kilogram relationship between REDACTED as supplier and REDACTED as customer ( Par. 47 ).

In addition to the successful use of sources and wiretaps, the incorporated Borchet affidavit details a trash pull conducted on February 3, 2005, at the home of the mother of

---

[6])It goes on to dismiss the Bracy wiretap with boilerplate language that "it is not likely that continued interceptions will reveal West's supplier(s), other Akron area, or other area drug associates, or the manner and means by which West conducts his overall drug dealing operation... " ( Par. 46)

[7]) That authorization was granted on November 4, 2005.

one of West's children in which agents recovered "a drug ledger with the nicknames of several known and unknown Akron area narcotics dealers with amounts next to their names that totaled $755,500. " ( Borcet Aff. Par. 40 ) It also sets forth an incident where West was arrested and $12,136 was seized from him which was eventually forfeited as narcotics proceeds.

6. Necessity summary

The Wehrmeyer Affidavit establishes that resort to the use of highly intrusive electronic surveillance was unnecessary in light of the proven success of conventional investigative techniques. The affidavit demonstrates the affiant's attempt to circumvent the dictates of Ippolito, Rice, and numerous other cases through misrepresentations, and boilerplate assertions.

Based on the Borchet and Wehrmeyer affidavits, the government has not met its burden in establishing necessity as mandated by 18 U.S.C. 2518 (c) and 3(c). Therefore, any evidence obtained as a result of the October 27, 2005 wiretap must be suppressed. Also, under the holding in Giordano that if the original interception order is tainted then the evidence obtained from extensions of that order is automatically tainted as well, any evidence obtained from the extensions of the October 27, 2005  wiretap must be suppressed.

      6. <u>If the court does not suppress all wiretap evidence based on the face of</u>
<u>the affidavit, a Franks Hearing should be held in that the defendant has</u>
<u>made a substantial preliminary showing of misleading statements by the</u>
<u>affiant in the October 27, 2005 affidavit.</u>

      In <u>Franks v. Delaware</u>, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the

Supreme Court held that if a defendant makes a substantial preliminary showing that an

affiant made statements in the affidavit that were either known by the affiant to be untrue

or were made in reckless disregard for the truth, a hearing must be held. <u>Franks</u> dealt

with the issue of whether the affidavit established probable cause after the false or

reckless statement was removed from it. However, the <u>Franks</u> analysis has been applied

to the " other procedures" showing to demonstrate necessity required by 18 U.S.C.

Section 2518(1)(c) and 3 ( c ). See <u>Ippolito</u> , supra at 1485-87.

      <u>Franks </u>requires that the defendant's "attack on the affidavit must be more than just

conclusory and must be supported by more than a mere desire to cross examine. There

must be allegations of deliberate falsehood or of reckless disregard for the truth and those

allegations must be accompanied by an offer of proof." <u>Franks</u>, supra, 171.

      The arguments set forth above demonstrate that a substantial showing has been

made that the affiant in this case either knowingly included false statements in the

affidavit or included those statements in reckless disregard for the truth. In fact, the

Wehrmeyer affidavit evidences a pattern of misleading statements and

misrepresentations. Those misrepresentations include; statements that the information

being obtained was of a "limited" and  "historical" nature despite clear evidence to the

contrary contained in other sections of the affidavit;  assertions that specific, two week old

information, that could be know only to an insider was " outdated" and lacked "specific

detail"; opinions of the affiant filling in failures to conduct obvious normal methods of investigation, or even to attempt them, such as blanket assertions that CS-6 couldn't develop rapport with his source, CS-11 couldn't buy from West associates, and that others who were recorded doing drug transactions would not be able to disrupt the organization . Additionally, the affiant's statements concerning attempted physical surveillance of West appear to be extremely suspect in light of the government's lack of knowledge of those attempts. Finally, the affidavit's silence on the question of incarceration of five of the government's informants as to when they went into custody, for what, and for how long, raises questions as to the veracity of that assertion.

The combination of the misrepresentations above gave the affidavit an appearance of an investigation in need of extraordinary methods in order to succeed. The reality was quite different. Without those misrepresentations it becomes clear that ordinary methods were succeeding and were likely to succeed in the future. Based on all of the arguments set forth above it is respectfully submitted that the defendant has met his burden and is entitled to an evidentiary hearing.


**B. ROY WEST'S WIRETAPED CONVERSATIONS MUST BE SUPPRESSED BECAUSE THE GOVERNMENT FAILED TO REASONABLY MINIMIZE NONRELEVANT CONVERSATIONS AS REQUIRED IN 18 U.S.C. 2518(5)**

Title 18 Section 2518 ( 5 )requires that any authorization to intercept " shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter."

The test for determining whether the monitoring agents reasonably minimized

irrelevant conversations is to look to the reasonableness of the agents actions in light of the circumstances. <u>Scott v. United States</u>, 436 U.S. 128, 137 ( 1978). The Sixth Circuit, in applying the <u>Scott</u> standard, cited fourth and second circuits holdings that " the minimization statute is deemed to be satisfied if ' on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion.' " <u>United States v. Feldman</u>, 606 F.2d 673, 678.

Both the October 7, 2005,  Borchet affidavit and the October 27, 2005, Wehrmeyer affidavit assert that:

> All wire interceptions will be minimized in accordance with Title 18, United States Code , Section 2518(5) Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Even if one or more of the named interceptees or their conspirators are identified as a participant in a conversation, monitoring will be suspended if the conversation is not criminal in nature or otherwise related to the offense under investigation. Such conversations will be spot monitored to determine if they have subsequently become criminal in nature.

Both the October 7, 2005 and the October 27, 2005 orders authorizing the wiretaps contain the requirement to minimize intercepted conversations. Additionally, the First Progress Report following the October 27, 2005,  authorization sets forth that all monitors were reminded of their responsibility to minimize conversations and that they all read and signed the attached minimization memorandum.[8]

The government tendered in discovery Title III line sheets. These line sheets

---

[8]) Defendant West requested a copy of the " attached" memorandum from the government. In response to the request the government informed West of its position  that under FRCP 16(a)(2) " internal governmental memoranda are not discoverable."

consist of a summary of telephone calls; the date and time of each call; whether it was incoming or outgoing; whether the subject matter was something the monitor deemed pertinent; whether the call was minimized or privileged; and a summary of the conversation. In addition to the line sheets , two progress reports relating to the October 27, 2005, order were filed with the authorizing court. The reports gave  a breakdown of the number of minimized and pertinent calls.

The first progress report filed on November 10, 2005 covered calls made from October 27, 2005  thru November 9, 2005. It states that there were 35 total conversations minimized out of 719 total line connections.[9] However, the line sheets for the period of time covered by the report reflect 22 calls were minimized.[10]

 A review of all of the intercepted conversations from October 27, 2005 thru February 23, 2006 reveals that the monitoring agents did not demonstrate any regard for the right of privacy and they did not do all they reasonably could to avoid unnecessary intrusion. In fact they intruded into conversations that they knew had no possibility of furthering their investigation. They listened to conversation after conversation involving West talking to numerous women having nothing whatsoever to do with crimes for which the wiretap was obtained. He talked to women about them going to school, about their haircuts, about going to the gym, about problems they had, about where they should

---

[9]) The report states that " connections" include mis-dials and both incoming and outgoing calls to which there was no answer or other verbal communication. However, the line sheets tendered to the defense lists 2839 call  "sessions" during that period of time.

[10]) The line sheets indicate that the agent apparently was able to increase the number of " minimized calls " by minimizing the same obviously irrelevant conversation more than once and then crediting each time he minimized the same call as a separate " minimized call."

meet and for how long, and numerous other topics of no significance to the investigation. They listened as West ordered pizza even after they knew he was speaking to a pizza pick-up. They listened to several conversations between Roy West and persons who were fixing  up his home. They learned what the price was to pour 31 yards of concrete, when the plumber had to work on the house, when the tile cutter could do his job, what needed to be done in the bathroom , and the price to build a driveway.The agents listened to calls between Roy West, his children, and the mothers of his children. The conversations concerned when Roy West was going to pick up the children, where he was going to take the children for the day, and about his child's day care.

The second progress report relating to the October 27, 2005, wiretap was filed on December 2, 2005. It includes conversations that were overheard from November 10, 2005,  thru November 25, 2005. It indicates 43 calls were minimized out of 2312 total line connections.[11] However, the line sheets indicate 12 conversations were minimized over this period of time. [12]

---

[11]) The number of phone  sessions listed on the line sheets goes from 2840 thru 7378 or 4538 sessions.

[12]) The first progress report to the November 29, 2005 authorization indicates that 36 calls were minimized out of 1370 total line connections. The line sheets reflect 22 conversations were minimized and that there were 2375 sessions. The second progress report to the November 29, 2005 authorization indicates 62 calls were minimized out of 2032 total line connections. The line sheets reflect 33 minimizations and 3410 sessions.
    The first progress report to the December 29, 2005 authorization indicates that 19 calls were minimized out of 1387 total line connections. The line sheets reflect 8 conversations were minimized and that there were 2323 sessions. The second progress report to the December  29, 2005 authorization indicates 27 calls were minimized out of 1356 total line connections. The line sheets reflect 14 minimizations and 2399 sessions.
    The first progress report to the January 27, 2006 authorization indicates that 28 calls were minimized out of 1402 total line connections. The line sheets reflect 20 conversations were minimized and that there were 2327 sessions.

In <u>United States v. Armocida</u>, 515 F.2d 29, 43 ( 3rd Cir. 1975) the court in considering a failure to minimize claim stated that " although statistical details of wire intercepts are by no means determinative on the issue of minimization, see, e.g. <u>United States v. Bynum</u>, 485 F.2d 490, 502 ( 2d Cir. 1973, ) ... they do provide a starting point for our analysis of the government's conduct in monitoring conversations. See, e.g., ... <u>United States v. Giordano</u>, 469 F. 2d 522 ( 4th Cir. 1972) rev'd on other grounds, 416 U.S. 505..."

In <u>Armocida</u> ,as to one defendant, 484 conversations were intercepted. Of the 484 intercepted conversations agents terminated 337 of them before they ended. As to a second defendant , 163 of the total 351 conversations were so terminated. Based on these numbers the court stated that " Without more, these statistics indicate to us that at the least a substantial effort was made to limit the number of interceptions and to minimize the interception of non-pertinent " innocent " calls. <u>Armocida</u> at 43.

In the case of Roy West the paltry number of minimized calls indicates that a substantial effort was not made to limit the number of interceptions and to minimize the interception of non-pertinent calls. This is especially true in this case when one looks to the conversations  the agents did not minimize when they had to have known that the conversations were irrelevant to their investigation. Also, although the agents set forth  in their affidavits that they would minimize non-pertinent conversations between named interceptees, a review of the line sheets and the conversations fails to reveal one time that such minimization occurred.

The government's clear failure to  minimize conversations in a reasonable manner

throughout the Title III wiretaps requires the suppression under 2518 (10) of all of the conversations recorded pursuant to the October 27, 2005, and subsequent authorizations.

### C. THE RECORDED CONVERSATIONS FROM OCTOBER 27 THRU NOVEMBER 25, 2005 MUST BE SUPPRESSED BECAUSE THE GOVERNMENT FAILED TO IMMEDIATELY MAKE THE INTERCEPTIONS AVAILABLE TO BE SEALED

18 U.S.C. 2518 (8) provides:

" The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable devise. The recording of the contents of any wire, oral, or other electronic communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsection (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517." ( Emphasis added)

" Immediately" [ as used in 2518 (8)(a)] is understood as meaning ''within one or two days' " United States v. Wilkerson, 53 F. 3d 757, 759 ( 6th Cir. 1995) citing United States v. Pedroni, 958 F.2d 262, 265 9 9th Cir. 1992).

In its Motion to Seal Wire Interceptions and related Documents the government stated that the interception of communications commenced on October 27, 2005, at

32

approximately 3:58 pm and ceased on Friday, November 25, 2005 at 11:59 p.m. At the

time monitoring was terminated no extension had been sought or authorized by any

court.[13] The Motion to Seal indicates that it was filed on November 29, 2005 at 10:12 a.m.

The Sealing Order is file stamped on the same day one minute later. However, the

Sealing Order signed by Judge John R. Adams indicates that it was signed on November

28, 2005 at 11:38 a.m. Whether the order was signed on November 28, 2005, at 11:38

a.m. or on November 29, 2005,  at 11:38 a.m., the government failed to have the tapes

sealed within two days. That failure, in the absence of a satisfactory explanation for the

delay in sealing the October 27, 2005  thru November 25, 2500  tapes, warrants their

suppression. See United States v. Ojeda Rios, 495 U.S. 257 ( 1990).


   **D. CONCLUSIONS**

   Based on the arguments set forth herein the West Title III wiretaps must be

suppressed in that : (1) the October 27, 2005, wiretap application fails to meet the

necessity requirements set forth in 18 U.S.C. 2518(1)( c ) and 3( c ); (2) all extensions of

the October 27, 2005, wiretap are the result of the original illegal wiretap; (3) the

government failed to reasonably minimize the intrusion into conversations in violation of

the  wiretap orders and 18 U.S.C. 2518 (5); and  the government failed to immediately

seal the recordings obtained pursuant to the October 27, 2005, order. Suppression is

warranted for each of the above reasons. However, in the event suppression is not

------

   [13]) An application for authorization for an extension and an order granting such
authorization was not filed and granted until November 29, 2005. The subsequent extensions
were all requested and granted within the 30 day period .

ordered, this honorable should conduct an evidentiary hearing pursuant to <u>Franks v.</u>

<u>Delaware</u> on the issue of necessity. A hearing is also necessary in order to determine the

facts relevant to the government's failure to meet the minimization requirement and the

sealing requirement.

Respectfully submitted,

<u>/s/Keith Spielfogel ( IL 2689537)</u>

<u>/s/Byron H. Pitts (P59079)</u>

Keith Spielfogel
190 S. LaSalle St.
Suite 520
Chicago, Il  60603
(312) 236-6021
spielfogel@sbcglobal.net

Byron H. Pitts
645 Griswold Street, Suite 3650
Detroit, MI 48226
(313) 964-7222
bpittslaw@sbcglobal.net

.